11FOIL, Judge,
dissenting.
I respectfully dissent.
One of the briefs filed in this case urges us to affirm the judgment of the trial court because the welfare and solvency of thousands of Louisiana and other creditors depends on a expeditious affirmation of the decision of the court below. I am certain that every member of this court is sympathetic to those who in good faith became creditors and have not been paid. However, that is not the issue in this case. Nor is this case about whether it is good or bad to have a land based casino in the City of New Orleans. The only issue is whether the legislature must approve the operating contract approved by the Louisiana Gaming Control Board on March 20,1998. The plaintiffs, two state senators, say that the legislature must approve it. The Board and the Governor, through the Attorney General, and the inter-venors say that the Louisiana Gaming Control Board may approve it without the concurrence of the legislature. They have an opinion of the Attorney General to that effect.
12From a practical standpoint, the majority opinion is totally unrealistic. It states that the Louisiana Gaming Control Board has the authority to renegotiate the casino contract. It further states that the legislature may elect to set aside the contract if it acts before the execution of the contract. What if the Board completed renegotiation of a contract at 1:00 P.M. on Monday afternoon, took a break to put it in final form, and then executed it the same day at 3:00 P.M.? It would be impossible for the legislature to call itself into session, come to Baton Rouge and vote all within a two hour period. It would also be impossible for the legislature to conduct a mail ballot within two hours. The majority opinion declares that the legislature has a certain amount of power in these matters. But as a practical matter, under the majority opinion, it has no power at all.
In 1992, the Louisiana Legislature created the Louisiana Economic Development and Gaming Corporation for the express purpose of entering into a casino operating contract with a- private gaming operator. Pursuant thereto, that corporation executed a casino operating contract with Harrah’s Jazz Company, in which Harrah’s obtained the right to operate Louisiana’s only land based casino at the site of the Rivergate Development on Canal Street in New Orleans, Louisiana. Harrah’s commenced construction of the casino, while at. the same time operating a temporary casino in New Orleans. In November of 1995, Harrah’s filed a petition in bankruptcy, closed the temporary casino, and *965 suspended construction on the permanent casino.
' When the temporary casino closed, there was no longer a' source of funding for the Louisiana Economic Development and Gaming Corporation. In 1996, the Legislature created the Louisiana Gaming Control Board, which on May 1, 1996, assumed all of the powers, duties and responsibilities of the Louisiana Economic Development and Gaming Corporation (Act 7, First Extraordinary Session of 1996).
13Prior to' 1996, the Louisiana Economic Development and Gaming Corporation had the following authority to renegotiate a casino contract:
A. The board shall have the right to set aside or renegotiate the provisions of any casino operating contract of a casino operator who is voluntarily or involuntarily placed in bankruptcy, receivership, conser-vatorship, or similar status.... (La.R.S. 27:245, enacted in 1992).
It is clear that the above provision applied to the Louisiana Economic Development and Gaming Corporation. It could have set aside or renegotiated the casino contract without approval of the legislature. The above provision was not repealed in 1996 when the Louisiana Gaming Control Board was created. This is what has created the problem in this case.
When the Louisiana Gaming Control Board was created in 1996, the following was enacted:
D. The governor by executive order, subject to legislative approval either by vote or by mail ballot, or the legislature by Act or Resolution may set aside or order that the corporation renegotiate the provisions of the casino operating contract of a casino operator who is voluntarily or involuntarily pláced in bankruptcy, receivership, conservatorship, or similar status. Any action so taken shall constitute the revocation or modification of a pure and absolute revocable privilege as provided in R.S. 27:202(C). Neither the state of Louisiana nor any political subdivision thereof shall be liable in damages for such revocation, modification, or order for renegotiation.
E. The governor by executive order or the board overseeing the operation of the casino, subject to legislative approval either by vote, or by mail ballot, or the legislature by Act or Resolution may negotiate a new casino operating contract.
(La. R.S. 27:224(D) and (E), enacted in 1996).
The above clearly applies to the Louisiana Gaming Control Board. It is also the latest expression of legislative will. It appears perfectly clear that the intent of the legislature was that any future casino contract 14entered into by the state, regardless- of who represented the state in the negotiations, had to be approved by the Legislature.
The Attorney General also argues that this is not a new contract, but a renegotiation of the old contract. He takes the position that the Louisiana Gaming Control Board can renegotiate the present contract without the approval of the legislature, since this is not a new contract, but the old one renegotiated. That does not appear to be the case. In the present and now final agreement, the parties are different and the terms of the agreement are quite different from the original contract. The present contract certainly appears to be a “new” agreement.
The Attorney General is correct in main-tabling that the constitutional issue of separation of powers is not an issue in this case under the facts established at trial. As in other areas, it is certainly permissible for the legislature to maintain a certain element of control on matters upon which it legislates. There are innumerable instances in which the legislature maintains control over boards which it creates by legislative acts, and over actions of the executive department.
The only issue at present is whether the Louisiana Gaming Control Board has the power to approve the contract without legislative approval. The answer is that it does not.
The judgment of the district court should be reversed and it should be declared that the Louisiana Legislature is the sole authority to finally approve or reject a casino oper *966 ating contract negotiated by the Louisiana Gaming Control Board.